The fourth district appellate court of the state of Illinois has reconvened. The Honorable Catherine E. Zienoff presiding. Good morning. This is case number 4-250676, Wesley M. Elam v. Brian Brinkman and Hy-Vee Inc. Appellants. Would counsel for the appellant please state your name for the record. Cameron Davidson. Thank you. And counsel for appellee? Kent Schnock. Thank you. All right. At this time, Mr. Davidson, you may begin your argument. Thank you, Your Honor. I appreciate your time today. And notably, Jeff Wright, who's also on the pleading for justice is on leave. So he's not with us here today. But a brief review of how we got here, why we're here. It's really a what could have been a very scary car motorcycle accident with a motorcycle driven by Mr. Elam and a delivery vehicle driven by Mr. Brinkman. We know that Mr. Elam was exceeding the speed limit while he was on methamphetamines and marijuana when he t-boned the car driven by Mr. Brinkman in a neighborhood intersection on August 1st, 2020 in Quincy, Iowa at the intersections of 6th and Cherry. Fortunately, Mr. Brinkman was not hurt. Unfortunately, Mr. Elam was not permanently disabled or any permanent restrictions. So how did we get here? As we have in the briefing, there's admission of a photograph with a stop sign that did not exist at the time of the accident. It wasn't redacted. It wasn't removed. It wasn't taken without it. It's a council wasn't it explained though by the witness that was testifying that when it was published to the to the jury that that stop sign didn't exist at the time that she witnessed the accident? Yes, that I believe that did happen, Justice Vansel. And I think the problem is it's like poisoning the well. It's like the $213,000 when the plaintiff's counsel said that Mr. Elam's responsible $213,000 in medical expenses, which he never was. It poisons the well. And it's repeatedly referred to by the it wasn't just a, oh, that's a mistake. Let me take it off. It's a let's use it as a as an exhibit and without any kind of redactions. And it becomes, you know, a part of the record. And we know from the Herzog case that the subsequent remedial measures are not admissible to prove prior negligence. And in this case, it's it was put up later. There's no evidence as to why it was put up. But presuming that it was, in fact, a subsequent remedial measure, it wasn't admissible. And in this case, it was. And it's, you know, plaintiff's argument wants to say, yes, it's not a big deal. It's it's was used for a bunch of other purposes. And they try to negate that when, in fact, they kept reaffirming what's in the photograph as a stop sign. And so it's something you you simply can't hold back. And I would argue around it as akin to the poisoning, the water poisoning, the well. The other things that were at issue that got us here is there's no instruction on plaintiff's impairment on methamphetamines and marijuana. And we know from Dr. Dooley, the anesthesiologist, critical care medicine specialist, pain management specialist, we couldn't find, I think, a more specialized individual to talk about it, nor were we required, we believe, justices to to offer such evidence and obtain that instruction on impairment. So we know Dr. Dooley is highly qualified. And I'll talk later, if time allows, for the other, the doctor and the police officer that also had testimony on that. The other things is meeting. Good morning. Sure. Sorry. Good morning. Yes. Do we have in this record the transcript of the jury instruction conference or the jury instruction that you're talking about? We have the proposed jury instructions and a citation in the record to what we offered as the instruction on impairment. And it's the Illinois pattern jury instruction. There is a typo as as counsel identified. It says impaired rather than impairment. But it's we offered instruction 12 Illinois pattern jury instruction 12.01, which states that impairment is no excuse for failure to act as a reasonable, careful person would act and goes further into what an intoxicated person is held to the same standard, et cetera. And if you find that he was intoxicated at the time, you may consider that fact together with other facts and circumstances. So it's for the jury to find he's intoxicated. It's the the parties and our instruction, proposed instructions 12.01 that included that impairment. And that's why Dr. Dooley testified in the case. And then that's also why Dr. There's two other another orthopedic surgeon that testified that included that opinion. And then the police officer. Well, as well, that went through that. The test is is simply that you're entitled to the instruction on a certain theory recovery if there is some evidence in the record to support it. And we have Dr. Dooley's testimony. And then we also have Dr. Mendel's testimony. And then we also have the retired police officer and accident reconstruction is Warren Biney, all who admittedly that the Dr. Dooley's was evidence that he testified the parts on Dr. Mendel and then officer Warren Biney. The court determined that they were inadmissible. And we believe, consistent with the arguments that that's in the record that both those should also be able to testify and not just Dr. Dooley. I think the plaintiffs. If I can just clarify, excuse me, Justice Fentzel, the answer to my question with regard to a transcript is no, there is no transcript of the jury instruction conference. Is that correct? I'm not. I couldn't find it this morning. Your Honor, when I look to confirm I have the. OK, thank you. You're welcome. I'm sorry, Justice. If I could follow up on that. Sure. The fact that we don't have the jury instruction conference and the last day of trial transcripts in the record. How should how should we handle that as a court? Yeah, there is there is no evidence on the fifth day of trial. The only the parties came back on Friday for for closing arguments. And we are not making any arguments unlike at the opening statement. Well, the plaintiff's counsel referenced that Mr. Elam is responsible for $213,000 in medical records. We're not making an argument that anything in the in the closing arguments were subject to the appeal. And that's instructions. I have. I believe those are part of the record, as I said in in response to Justice Zinoff. I don't I didn't see the site. I couldn't see the citation this morning on where it is in the record. We did submit proposed your instructions to the court as well. The primary substantive argument that plaintiff makes is simply that you shouldn't consider with regard to the intoxication instruction that plaintiff admitted was a part of what was offered by defendants in their briefing. Their substantive argument is simply that, you know, Dr. Dooley's you shouldn't rely on Dr. Dooley's opinions. It's details on how to interpret the drug test. There's a statement in the drug test that you shouldn't use it. Of course, Dr. Dooley answers to that, that they routinely rely upon those drug tests. They just don't like the opinion. And of course they don't because it shows that he had methamphetamines and marijuana in his system, that he was in fact impaired at the time he was operating the motorcycle. And then the final argument that is somehow a confusing instruction, it's the Illinois pattern jury instruction that was proposed. It's an instruction consistent with the pattern jury instructions that have been vetted and and presumably have been used in other cases as well. And it's, and again, it's not whether it's all the evidence, it's just some of the evidence. It's not demanding that the test is not that it's, you know, a significant amount. It's just some evidence and clearly Dr. Dooley did testify to that. Another reason we're here today is the admitting of the guilty plea. And we cite the Goldberg case there and it's with that case, with that, the Goldberg says, hey, is there other evidence? What's the, is it the primary piece of evidence or is it alone can be used? No, it cannot. Guilty plea should not. And why is that? It's because what it can do to a jury, what impact that can have on the jury. When the jury's the fact finder here, they're to make the determination of what happened and who's responsible. I think the Goldberg case identifies the concern with just paying a fine and that that's what happened in here. Goldberg is a little different than that defendant made an admission that he didn't apply breaks in time and it was too close. And that that was a cause of the concluded that he was not negligent. But the court, I think in this, in that case and in here notes that it's, I think the strong position, let the jury take the facts, whatever the facts are in this case and make the determination and not rely on something that's just a a paying a fine rather than hiring an attorney and defending himself in that case. It just, if I can just ask, there was no objection at the trial level by the defendant when this was introduced, isn't that correct? We did it as in our motion limine prior to trial in the court, denied it and admitted the elected. I think actually under the court initially agreed with us that the guilty plea would not be admitted and later changed position to through motion limine that that would be admitted. And that honestly your honor, I can't recall if that was plaintiff's motion limine or defendant's motion limine. Counsel, is there a report of proceedings for that hearing in the record? It's in the records. I'm sorry if I interrupted your justice. No, go ahead. I believe it's in the record. I don't have the citation in front of me, but the entire history of the case was included in the record. But there was no contemporaneous objection when this was introduced, correct? I don't specifically recall, Justice Zinoff. I recall it being as a part of their motion limine. The court had already ruled upon it. With regard to the experts that can't talk about it, impairment, there's two experts, both I think highly qualified to talk about impairment that weren't admitted and that would be the orthopedic surgeon, Dr. Mendel, and then the police officer and accident investigator. There's no disagreement on the authority cited therein. Dr. Mendel, we know, he reviewed all the medical records, included the lab results, the types of drugs detected, the impact of drugs. He reviewed the depositions of the treating physicians, and he offered his opinions within a reasonable degree of medical certainty. Other than finding a doctor, orthopedic surgeons, just as the pain specialist or anesthesiologist are, as Dr. Mendel testified, responsible for knowing the impact of drugs in their profession and conducting surgeries and such. Warren Biney, he's an accident reconstructionist. He's a retired police officer. He has an extensive background on the criminal side of things in identifying when somebody's impaired. He's taken classes for it, identified the impact of impairment on the reaction time. He's familiar with drug screens. He's testified in criminal cases with a higher burden of proof, which identifies how drugs like methamphetamines or marijuana can impact the system. And the court just allowed it, and then we did an offer of proof where it went through Officer Biney's significant history and testimony with regard to the impact of methamphetamines and marijuana in the system relative to how it impairs somebody and their ability to react. Plaintiff's argument in part is it's common knowledge that you would know whether methamphetamines or whether the marijuana impacted the system, and we simply beg to differ. Is that a suggestion? I don't think that is a suggestion that jurors have some experience with illicit drugs or have some particular expertise on how methamphetamines or how the marijuana may impact the system. And also, a big contention in the part of our case was the instructions on future damages and lost wages. We know from the evidence from the doctors that they, well, first of all, the trial court initially through the motion limine excluded evidence of permanent injury, brain trauma causing memory issues, permanent disfigurement, or future pain and suffering. And that was through the motion limine process. And then at the time, the court, it's in the record where the court says it could testify on past and present state of health. And the evidence never changed. Those depositions were evidence depositions that were part of the record and read into the record, but part of what the court heard in the motions limine, all those depositions were completed. The doctors, both treating doctors confirmed there's in fact no permanent impairment. The doctors said there's no permanent restrictions and no permanent disability. They both testified to that plaintiff's or Mr. Elam's argument is. Another part of it, when you look at the case law too, and you look at SOTO or you look at even like Maddox, and there's another case that SOTO cites that you look back, when was the last time the treaters, one of the key factors is when was the last time the treaters provided any treatment? And in SOTO it was 30 months. That was consistent with another case that SOTO cited. Here, there's no treatment at all since October 22, that's 29 months. And the physical therapy that he missed and was thrown out from, it would have been 52 months. So, the doctors testified consistent with that, that there's no permanent impairment, no disability, and there shouldn't have been instructions, plaintiff's argument, could, would, maybe, all those kinds of things, possible. The doctors had already attested there's no permanent impairment or disability, very clear, the stuff of could, would, possible, that's not enough, particularly when they affirmatively state there's none. The court got it right when it reviewed the evidence in the motion and should have changed it, or we argue around it should have, justices should have been the same. Thank you for your time. I understand, but time is up, so I, thank you. Thank you. You may begin your argument. Thank you, Your Honor. May it please the court, there are a host of issues before you. I'd like to focus on two of those issues. The first is the trial court's ruling on the collateral source rule, and secondly, the arguments that we've raised with respect to waiver and forfeiture. As far as the collateral source rule, it's the plaintiff's position that the trial court did exactly what he should have done, which is prevent the defendants from attempting to introduce evidence in front of the jury that would constitute a direct violation of the collateral source rule. That evidence is contained in the offer of proof that was made by the defendants when our records custodian was finished testifying, so we know exactly the evidence that the defendants were trying to introduce, and we know exactly the reasons why the trial court refused to allow that evidence to be presented. A lot of time in our briefs, both of the briefs, was spent on this collateral source issue. At the end of the day, and I'm at fault largely to some extent for going into the historical background, I thought that that was important, but at the end of the day, all you need to know as far as the collateral source rule in this case is two words. It's follow wills. The Illinois Supreme Court's decision in the Wills case, I believe back in 2008, and the principles that were enunciated by our Supreme Court in Wills are directly applicable to the court's correct ruling in the case at bar. One of the principles is that the defendants cannot introduce evidence that the bills were settled for a lesser amount. That is precisely what the defendants tried to do in this case, and that is precisely what the trial court prevented. Wills also stands for the proposition that a jury cannot hear anything, their words emphasized, anything about collateral payments. Again, that is precisely what the defendants attempted to do in our case, and that is precisely what the trial court refused to allow. Wills stands for the proposition also that benefits intended for the victim should not be a windfall for the defendant, for the tortfeasor. Again, that is precisely what the defendant's testimony was attempting to do, to take advantage of what Medicare had done to wipe most of these bills out, and that is precisely what the trial court would not allow. Another principle from the Wills case is the tortfeasor cannot take advantage of the victim being old and covered by Medicare, or being of low income and covered by Medicaid. Again, that is precisely what the defendant attempted to do in the case at bar, and precisely what the trial court said no. And then finally, the direct holding in Wills was you cannot present evidence about Medicaid payments. That's the fundamental ruling in Wills, and that is almost precisely what the defendants tried to do in our case. The reason I say almost is that they make, try to make some hay out of the fact that they never used the word Medicaid, that all they were talking about is that somebody had a contract with Blessing Hospital, and based on that contract, that only $34,000 or $35,000 out of the $213,000 was paid. So they claim that they can basically side skirt Wills and do indirectly what Wills specifically says you cannot do directly. And I would suggest to the court that that's even worse than what the court tried to do in the Wills case. And the reason is the approach taken by the defendants would entirely confuse any normal jury as far as what sources are we talking about? Who has these contracts? Where does this all come from? And it would invite the jury to speculate about all of that information. And maybe even more importantly, if we allow this type of evidence to be presented to a jury in contradiction to the collateral source rule, what we essentially do in any case where the provider accepts Medicare or Medicaid, you eviscerate the rule itself. Most, I looked into it and I cannot represent to the court a percentage of providers that accept Medicare or Medicaid. I believe that the vast majority of providers and hospitals do in fact accept those patients. If I'm right, that means, and if the defendant's position is right, in any of those cases, instead of enforcing the collateral source rule, the tortfeasor is going to be able to say, hey, isn't there a contract that you guys have where instead of taking 100% of the bills charged, you will accept a small percentage. So in effect, if you accept the defendant's position, you have effectively eviscerated the rule itself in any case where the provider accepts Medicare or Medicaid. Another reason that I believe that the defendants are incorrect in their position is IPI instruction 3.03. I referenced it in our brief and what that instruction specifically says is it tells the jury you will not speculate or consider any possible sources, any other possible sources of payment. Now, here's the irony, the defendants are trying to present evidence of other possible sources of payment. That was their their argument, that was their testimony in the offer of proof. But on the other hand, we know at the end of the trial, the judge is going to specifically instruct them, thou shall not consider that evidence and you will not speculate on what that evidence actually is about. So the defendants are wanting to present evidence in effect, knowing that at the end of the trial, the judge is going to specifically tell them, you can't consider it and you can't speculate about it. And then the final, kind of to bring everything full circle, the way that I at least can best understand the collateral source rule is with a hypothetical. It's a very simple, very short hypothetical. We have five different cases, everything is identical except for one thing, all the damages, the facts, the recovery, the medical bills, everything is identical. In the first case, the victim doesn't have any insurance and they're on the hook for the entire amount of medical bills. In the second case, the victim has insurance, say Blue Cross Blue Shield, an 80-20 policy, and the victim's on hook for 20% of the medical bills. In the third case, the victim is older, has Medicare, and Medicare is going to basically pay for the vast majority, if not all, of the medical expenses. In the fourth case, we have a low-income individual or someone otherwise qualified to have Medicaid, and in that case, Medicaid pays a small portion and the rest of the debt is wiped out. That's what we've got here. And then in the fifth case, we've got a victim who is lucky enough to get free treatment. It's kind of like the Peterson case that the Supreme Court discussed, and that, again, was completely reversed by wills, but in Peterson, Shriners Hospital was involved. And so the treatment wasn't, there wasn't any charge for the treatment, and the argument in Peterson was, well, if there's no charge, then they can't have any recovery. And back then, Peterson said, you're right, there's no doubt, you know, the plaintiff isn't responsible for anything, so the plaintiff, we're not going to allow that. That was specifically overruled by the wills case. So what wills is saying is, if you get free treatment, you still are entitled to the reasonable value of those medical services. The point is, in each one of those five cases, identical cases, you have plaintiffs that are in an entirely different position as far as their liability, their personal liability, what they're going to have to pay out of pocket. And in each one of those cases, the result should be exactly the same. The tortfeasor is responsible for the reasonable value of those medical expenses. It doesn't matter if it's all of the tortfeasor, excuse me, all of the victim's responsibility, or if it's only 20% because of insurance, or Medicaid, or Medicare was involved, or if the services were free, the end result is the same. I think that the trial court did an absolutely fabulous job, first of all, making sure that the plaintiff, that we presented evidence that the entire bill of $213,000 was reasonable. We did that. We did that through not only medical testimony that went literally through visit by visit, and treatment by treatment, and diagnostic by diagnostic, and surgery by surgery, but we also did it through the head honcho at Blessing Hospital in the billing department. All of that evidence came in. And what the trial court did is it properly prevented the jury from hearing evidence that should be excluded under the parole evidence rule. And we believe that the trial court did exactly what it should have done when it should have done it. The only other issue that I wanted to address has to do with waiver and forfeiture. And I appreciate some of the questions that the court has already raised. It's clear that the court understands the position that we are coming from. There's really four things I want to discuss, and I'll do this very briefly. There are significant omissions in the record on appeal. The last day of trial, which included the instruction conference, you don't have it. The hearing, a very lengthy, significant hearing on lengthy motions in limine back in August of 2023, where a lot of the same issues that are before you right now were argued extensively before the trial court. You don't have that transcript. And then in December of 2024, shortly before trial, this was at the pretrial conference, a lot of those same issues came up again. And again, that is a transcript that you do not have before you. And to answer one of the justices' earlier questions, how do you handle that? Well, the law is clear. It's the appellant's responsibility to give you the record on appeal. And if they're complaining about error in a proceeding, they got to show you the proceeding. And the defendants have failed to do that repeatedly on several of these issues that are before you. The other second thing I wanted to mention is it's a real mess with the unredacted transcripts of Drs. Dooley and Dr. Mendel. You have in the record the full evidence deposition that contains all the objections and all, excuse me, just all of the objections. What you don't have, what you don't know, unless you really want to do a lot of work, is to figure out what the jury heard. Because there was well over, by my count, a hundred objections. A lot were sustained, a lot were denied. But with what you've got, unless you want to take the transcripts in the one hand and compare them to the 100 plus rulings of the trial court, you're not going to be able to determine what evidence did the jury actually hear. Because that testimony, when the video was played to the jury, all of that had been edited out. And if there was a transcript made of what the jury heard, I'm not aware of it. And it is not in the record on appeal. The third thing as far as the forfeiture issue is that the first three issues raised by the defendants relate to claimed errors with respect to jury instructions. We've already discussed the fact that they didn't provide this court with the instruction conference. But there's another reason that they've got waiver problems with those first three issues. And that is that they didn't propose an alternate instruction. If you want to preserve air regarding instructions, with few exceptions, you have to give the court what you believe to be a correct instruction of the law. In each one of those first three issues raised by the defendants, all they're doing is saying the instruction you guys, the plaintiff gave, and the plaintiff tendered and the court gave, that that was wrong. But if you're going to preserve that air, you got to be able to show that you showed the court a proposed jury instruction, an alternate jury instruction that did in fact accurately state the law. And then finally, and this has already again been addressed by at least one of the justices, and that is to a very large extent, if you don't make a contemporaneous objection when evidence is tendered, you can't claim error on appeal. And I think the mistake, with all due respect to the defendants, is that they are under the impression that if you lose an issue in a motion in limine, that you can raise it on appeal. And the best example of that is the guilty plea that counsel talked about early on in his argument. I think the record's very clear that the court ruled that that guilty plea could come into evidence. When it was brought up and tendered at trial, when we attempted to introduce it as an exhibit, what the defendant said was, the court has already ruled we don't have any objection. They specifically indicated on the as I understand it, the law is exceptionally clear. If you are going to raise that kind of error where the court supposedly makes a mistake during a motion in limine hearing, you must then make a contemporaneous objection at trial in order to preserve that error. And the reason, at least one of the reasons, is it gives the trial court the opportunity to correct a mistake that he or she may have made. But you've got to have that contemporaneous objection. And really, to me, the most surprising thing is I assumed that in the reply brief that there would be a considerable effort to try to address these forfeiture arguments that I raised in the appellee brief. And the only response in that reply brief filed by the plaintiff was that the plaintiff's arguments about forfeiture are false. A one-word response to all of these arguments regarding the omissions, the transcripts, the failure to preserve error through contemporaneous objections, the lack of an alternate instruction, none of that was addressed either in the oral argument or in the reply brief. At the end of the day, many of the issues that are presented by the defendants have been forfeited or waived. Most of the issues raised by the defendants are predicated on false premises, but all of the arguments, all nine or ten of the issues raised by the defendants on appeal are without merit, and we would respectfully request that the trial court be affirmed. Thank you. Thank you, counsel. Mr. Davidson, your reply argument? Thank you, Justice Enos. To note, you can see in our brief we cite to the record with regard to the submitted Illinois pattern jury instruction C-250 to C-262. With regard to the extensive argument that was made on the plaintiff's counsel, Mr. Elam's counsel says based on false premises, well, on many of these arguments, we don't have any challenges to our legal citations on almost every single argument that's made. With regard to the reasonableness of medical bills, I didn't count, but I heard a lot of discussion, and it was the same argument we've heard before, was on the collateral source rule. Collateral, collateral, collateral, collateral. It's not a part of the case. It's not the test. It's the reasonableness and necessity of medical it's the bill to mount and then defend it as we in the decided cases. It's free to challenge plaintiff's proof on cross-examination and to offer their own evidence. The Verchie court applied the reasonableness rule and in that case overturned what the court did because it limited the trial court had limited the litigant, the defendants to challenge the reasonableness. And in that case, it was the cash rates, other ways that they pay and the challenge directly to the doctor on how he was paid. So if I can just ask, I mean, isn't this Verchie case really distinguishable in that they advertised lower cash prices for the same services and Blessing Hospital really didn't do that. None of that came out through Dr. Johnson's testimony or any other way. So how is that case helpful to? Yeah, I don't think that the test isn't whether they advertised alone. It's looking at the entire what evidence do you have on reasonableness? What are you offering on reasonableness? Well, so cash rates is one thing. And what we did in this case, plaintiff made the offer of that the reasonableness is the amount billed and that's amount they billed in this case. That's Cheryl Johnson that testified of that. She also testified in the offer of proof as to what was reasonable, that they routinely accept discounted amounts in full satisfaction, that that is reasonable, that their fee schedule for the amount that was paid is actually is reasonable. She testified there's a wide range of amounts that are considered reasonable. The amount they received was $34,000 to $35,000. That's what they received as full and final satisfaction and as she testified is a reasonable amount for the services incurred. It's not collateral source. It's not any particular piece of cash rates or how they advertise whether they whether Blessing goes out on the market and say this is what we advertise. In here, the facts are different. It's a fee schedule. That's also a reasonable amount. She testified that their fee schedule that they use to get reimbursed is reasonable. We would argue that's analogous to cash rates or to advertising. Here's what it is. It's the amount that they believe is reasonable just like Blessing believes that this amount is reasonable. The other, so Cheryl Johnson did a nice job of testifying. They think the billed amount is reasonable. They also, she also went through several factors as I discussed of why the amount that they received in payment is also reasonable. Most, I think most poignant is that's their fee schedule. Whether or not they post it, they advertise it, I think is not distinguishable in this case, Your Honor. The other thing I wanted to quickly point out, it's okay. If you want to just finish your sentence. Sorry, I didn't turn on the clock there. It's just the opening the door was saying that Mr. Elam was responsible for $213,000 damages. He clearly is not. As I said, that's poisoning the well or poisoning the water, as the People vs. Waiters case says. Thank you for your time, Justices. Okay. Thank you very much, Counsel. Thank you both for your arguments this morning. The Court will take the matter under advisement and render a decision in due course. Court is adjourned for the day. Thank you very much.